UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KATE MILLS,
            Plaintiff,

v.                                          Case No. 08-14291
                                            Honorable Patrick J. Duggan

WALTER RODABAUGH, JEFFREY
BROOKS, and COUNTY OF LAPEER,
            Defendants.
_____/

ANDREW MILLS,
            Plaintiff,

v.                                          Case No. 09-10921
                                            Honorable Patrick J. Duggan

WALTER RODABAUGH, JEFFREY
BROOKS, and COUNTY OF LAPEER,
            Defendants.
_____/

## OPINION AND ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

At a session of said Court, held in the U.S.
District Courthouse, Eastern District
of Michigan, on December 22, 2009.

PRESENT:   THE HONORABLE PATRICK J. DUGGAN
           U.S. DISTRICT COURT JUDGE

These consolidated lawsuits arise from the search of a farm in Imlay County,

Michigan, the seizure of live and dead animals found on the farm, and the subsequent

prosecution of Plaintiffs and their parents, Ellen and Mark Mills, of killing or torturing an

animal, animal cruelty, failure to bury an animal, and having an unlicensed dog.

Presently before the Court are Defendants' motions for summary judgment pursuant to

Federal Rule of Civil Procedure 56(c), filed on September 29, 2009. The motions have been fully briefed and the Court held a motion hearing on December 10, 2009. For the reasons that follow, the Court grants Defendants' motions.

## I.     Standard for Summary Judgment

Summary judgment is appropriate if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(c). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S. Ct. 2505, 2512 (1986). After adequate time for discovery and upon motion, Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).

The movant has an initial burden of showing "the absence of a genuine issue of material fact." *Id.* at 323, 106 S. Ct. at 2553. Once the movant meets this burden, the "nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986) (quoting Fed. R. Civ. P. 56(e)). To demonstrate a genuine issue, the nonmoving party must present sufficient evidence upon which a jury could reasonably find for that party; a "scintilla of evidence" is insufficient. *See Liberty Lobby*,

2

477 U.S. at 252, 106 S. Ct. at 2512.  The court must accept as true the non-movant's
evidence and draw "all justifiable inferences" in the non-movant's favor. *See id.* at 255,
106 S. Ct. at 2513.

## II.      Factual and Procedural Background

On March 15, 2007, Defendant Lapeer County Sheriff Deputy Jeffrey Brooks and
Lapeer County Sheriff Deputy Mark Radenbaugh were dispatched to meet Federal
Marshal Matthew Batcheller at the Imlay City Police Department.  Upon their arrival, the
deputies learned that they, along with Michigan State Trooper Dennis McGuckin, were to
assist Marshal Batcheller in executing a federal civil order, signed by the Honorable
Victoria A. Roberts.

The civil order allowed Charter Communications access to a cable box and cable
box equipment located on the property at 6427 Weyer Road in Imlay Township,
Michigan.  The property consists of a small farm, which is owned and occupied by Ellen
and Mark Mills ("Mrs. Mills" and "Mr. Mills").  (Doc. 28 Ex. 4.)  Judge Roberts further
ordered Mrs. and Mr. Mills and "their agents and representatives and all other persons
acting in privity or in concern with [them] . . . from interfering with, impeding, or
hindering or otherwise obstructing" Charter Communications' access to the equipment.
(*Id.*)  Finally, the order directed the United States Marshal's Office to maintain a presence
at the address "as it deems reasonably necessary in order to assist the court in
enforcement of the terms of this order."  (*Id.*)

Charter Communications had sought the assistance of law enforcement officials

3

when its technicians went to the Mills' property due to the Mills' previous hostile and sometimes violent responses to its and other utility companies' technicians. (Doc. 37 Ex. 29.) In an affidavit submitted in the case before Judge Roberts, Charter Communications' Tech Operations Supervisor explained that "on multiple other occasions" Mr. and/or Mrs. Mills "ha[d] been very belligerent toward Charter Communications employees when the employees attempted to access the cable box on their property," causing a technician on one occasion to call the police. (*Id*. ¶¶ 4, 6.) On another occasion, Mr. Mills attempted to run over a technician with his tractor and, in a separate incident, he ran his tractor into a pole while a utility technician was on the pole. (*Id*. ¶¶ 5,7.) In fact the Mills' residence was "well-known within all the police departments in the area," as local law enforcement officials had been called to the property on a number of previous occasions and officers found Mr. and Mrs. Mills and their son, Plaintiff Andrew Mills ("Andrew"), uncooperative and "unstable" in those dealings. (Doc. 28 Ex. 3 at 14-15.) As a result, when officers respond to the property, they usually "go in numbers . . . for the officers' safety." (*Id*. at 15.)

When Judge Roberts' order was executed, Andrew was eighteen years old and living with his parents on the property. Plaintiff Kate Mills ("Kate"), the Mills' daughter, was twenty one years old at the time and a full-time pre-veterinary student at Michigan State University. From August 2006 through mid-May 2007, Kate was residing in an apartment in East Lansing, Michigan.

Deputies Brooks and Radenbaugh, Officer McGuckin, and Marshal Batcheller

4

arrived at the Mills' property at approximately 9:00 a.m. on March 15, 2007.  Deputy

Brooks noticed three dogs on the property: one chained to the front porch, a second in the

backyard chained to a tree, and a third in a fenced-in pen.  There did not appear to be any

food or water for the dogs and Deputy Brooks observed that "their ribs were showing and

they [did not] look [to be] in very good shape."  (Doc. 28 Ex. 3 at 24.)  Deputy Brooks

and Officer McGuckin approached the residence and knocked on the front door to

announce the officers' presence.  Nobody answered.  As Deputy Brooks and Officer

McGuckin proceeded to the side of the residence, they noticed a pole barn with its entry

door open.

According to Deputy Brooks, he approached the pole barn to announce the

officers' presence and see if anyone was inside.  Either from outside the pole barn door or

after stepping inside, Deputy Brooks saw what appeared to be two dead baby lambs

laying on the floor outside one of the pens.[1]  Deputy Brooks immediately radioed

Defendant Walter Rodabaugh, the Director of the Lapeer County Animal Shelter, and

informed him about the condition of the three dogs and the presence of the dead lambs.

Deputy Brooks asked Director Rodabaugh if the latter's officers could be sent to the

property.

---

[1]During his deposition in this case, Deputy Brooks testified that he saw the dead
lambs before he entered the barn door.  (Doc. 28 Ex. 3 at 22.)  During the preliminary
examination in the criminal case against Plaintiffs and Mr. and Mrs. Mills, Deputy
Brooks testified that he entered the barn and then saw the dead lambs.  (Doc. 34 Ex. H at
124-25.)

5

Lapeer County Animal Control Officers Carla Frantz and Diane Woolner were dispatched to the property.  When they arrived, Deputy Brooks showed them the dead lambs inside the pole barn.  Officers Frantz and Woolner and Deputy Brooks then discovered a dead horse inside one of the barn stalls "that appeared to have been there a while."  (Doc. 28 Ex. 7.)  The horse's hip and back bones were protruding.  There were ten live sheep and a live lamb in the barn, which had no water or food.  The officers then discovered five additional dead lambs.  Two of these animals were a few feet away from the originally discovered dead lambs; three of the animals were found inside a feed bag with their legs sticking out.

At that point, the officers decided to contact the Lapeer County Prosecutor's Office.  County Prosecutor Byron Konschuh advised the officers that the warrant permitting the U.S. Marshal's presence on the property covered them and that they should continue to assess the situation.  (Doc. 28 Ex. 6.)  Officers Frantz and Woolner then observed five horses and a cow in a pasture on the property.  Except for one horse that appeared underweight, the remaining animals appeared fine.  However, the officers observed no water or food for the animals.  Walking toward the back of the property, Officers Frantz and Woolner came upon a shallow pit with water, in which there were several dead animal carcasses.

Deputy Brooks and Officers Frantz and Woolner then proceeded to the County Prosecutor's office to seek a search warrant.  Deputy Brooks prepared and signed the affidavit in support of the warrant, which County Prosecutor Konschuh and a magistrate

6

judge signed.  (Doc. 28 Ex. 9.)  The search warrant authorized the search of the Mills'
property and the seizure of "any animal determined to be neglected by a veterinarian and
carcasses deemed necessary for evidentiary purposes."  (*Id*.)

 The officers thereafter spent six hours on the phone trying to locate a veterinarian
willing to accompany them to the property when the warrant was executed.  (Doc. 28 Ex.
5 at 49-50.)  They were unable to find one.  (*Id*.)  County Prosecutor Konschuh therefore
advised Director Rodabaugh to accompany the officers, assess the animals, and determine
which animals needed medical care.  (*Id*. at 15.)

 On March 16, 2007, Director Rodabaugh accompanied Lapeer County Deputies
Don Brady, Mark Radenbaugh, and Orrie Smith and Lapeer County Animal Control
Officers Frantz and Woolner to the Mills' property to execute the search warrant.  As they
were arriving, Mrs. Mills came out of the residence and began screaming at the officers.
(Doc. 28 Ex. 5 at 17.)  The officers explained that they had a warrant and, at that point,
Mr. Mills came outside the house and was very irate and screaming.  (*Id*.)  One or more of
the officers explained to the Mills that the officers were there to assess the animals
according to the warrant.  Mr. and Mrs. Mills then took one of the dogs into the home and
three deputies and Director Rodabaugh followed them inside.  Director Rodabaugh asked
Mr. and Mrs. Mills questions about the conditions of the animals, to which they
responded: "You're the investigator, you find out."  (*Id*. at 19.)  Andrew was present on
the property when the search warrant was executed and interacted with the officers.  (*See*
Doc. 28 Ex. 11.)  The officers eventually seized, at Director Rodabaugh's direction, the

three dogs observed on the property the day before, as well as the dead horse and seven dead lambs.

The three dogs were taken to Thorpe Animal Hospital for evaluation by a veterinarian, Dr. Tracy Thorpe. The dead animals were taken to Michigan State University for necropsies, which were performed by Dr. Dalen Agnew.

Dr. Thorpe reported that all three dogs were emaciated and suffered from severe diarrhea and intestinal parasitic infections. (Doc. 28 Ex. 15.) Dr. Thorpe highlighted in her report that the number of parasite eggs on the dogs' fecal exam was the worst she had ever seen. (*Id.*) She ranked two of the dogs as having a "body condition score" of 1 out of 10 (a score of 5 represents a normal body condition score), with generalized muscle atrophy including masseter muscles of the head. (*Id.*) The third dog had a body condition score of 2 out of 10, with no palpable body fat. (*Id.*) Within a week of being under Dr. Thorpe's care, all three dogs were eating and drinking great, their diarrhea was under control, and they had gained weight. (*Id.*) Dr. Thorpe provided the following opinion regarding the dogs' condition:

> The severity of the weight loss and bloody diarrhea as seen in the above mentioned animals would not be difficult for a person to notice with little experience working with animals. I am confident that without immediate veterinary care these dogs would have died of dehydration, starvation, anemia and/or septic shock. In my professional experience, body condition scores of one or two would take a healthy animal months or years of deterioration to develop. The masseter muscles of the skull are one the last muscles to atrophy in response to starvation. The speedy response of these animals to treatment and current state of good health indicates that

8

they were deprived adequate care for months or years.
(*Id*.)

Dr. Agnew reported that the dead horse was "markedly emaciated with decreased skeletal muscle mass and minimal subcutaneous and intra-abdominal fat stores." (Doc. 28 Ex. 16.)  He further found evidence of severe esophageal obstruction or "choke," which he explained "can relate to behavioral abnormalities (e.g. voracious eating due to starvation or psychosis), dehydration, abnormal hypertrophy of the esophageal musculature (not evident in this case), or can be present as an incidental finding." (*Id*.) Dr. Agnew made the following comments as part of his final diagnosis:

> Pertinent findings in the death of this horse are esophageal obstruction associated with severe dehydration, emaciation, and aspiration pneumonia.  Although the esophageal tissues are too autolyzed to permit evaluation of the inflammatory response, the horse's emaciation, the presence of multifocal mineralization, and the degree of esophageal obstruction suggests [sic] a subacute to chronic (progressive) timecourse.

(*Id*.)

As to the seven dead lambs, Dr. Agnew reported that six had moderate to severe blood staining of the muzzle and three had one or multiple limb fractures that were likely traumatic. (Doc. 28 Ex. 17.)  Two of the lambs had severe, multifocal, acute cervical and cranial hemorrhage, also likely traumatic. (*Id*.)  Three of the lambs were dehydrated and all lambs were emaciated, suggesting starvation. (*Id*.)

On March 23, 2007, Director Rodabaugh completed a Lapeer County Prosecuting Attorney Warrant Request and Disposition proposing the following charges against Kate

and Mr. and Mrs. Mills: animal cruelty (horse) in violation of Michigan Compiled Law
Section 750.50; animal neglect (dogs) in violation of Michigan Compiled Law Section
750.50; and no valid license for four dogs.  (Doc. 26 Ex. R.)  Except for the latter charge,
Director Rodabaugh proposed the same charges against Andrew.  (*Id*.) Based on the
information submitted by the various officers in the case, on March 30, 2007, County
Prosecutor Konschuh charged Kate, Andrew, and Mr. and Mrs. Mills with the following:
killing or torturing an animal (horse) in violation of Michigan Compiled Law Section
750.50b; animal cruelty (dogs) in violation of Michigan Compiled Law Section 750.50;
and failure to bury an animal (horse and lambs) in violation of Michigan Compiled Law
Section 750.57.  A charge of having an unlicenced dog subsequently was added. The
Mills were advised by letter of the charges and were allowed to turn themselves in, where
they were booked, arraigned, and released.

        In defense of the charges against her, Kate argued that she did not live on the
property but instead resided in East Lansing and that she was not the owner of the
animals.  (*See* Doc. 28 Ex. 18.)  At a hearing on June 11, 2007, the state court judge
concluded that Kate was the owner of the horse but that she was not caring for the
animals, as she was living in East Lansing as a full-time student.  (*Id*.) The judge
therefore dismissed all of the charges against her.  (*Id*.)  Without explanation, the judge
also dismissed the charges against Andrew at a hearing on September 18, 2008.  (Doc. 28
Ex. 20.)

        On March 24, 2008, Kate filed a lawsuit against Defendants in this Court.  *Mills v.*

*Rodabaugh, et al.*, Civil Case No. 08-11262.  A stipulated order dismissing the action without prejudice was entered on June 20, 2008.  On October 8, 2008, Kate re-filed her lawsuit.  Andrew filed his lawsuit on March 12, 2009.  Kate and Andrew allege the following claims in their complaints against all Defendants: (I) false arrest and/or false imprisonment; (II) malicious prosecution; (III) negligent prosecution; (IV) intentional infliction of emotional distress; (V) abuse of process; (VI) violation of the Fourth and Fourteenth Amendments to the United States Constitution pursuant to 42 U.S.C. § 1983 as a result of unlawful searches and seizures, Plaintiffs' unlawful arrest, and the deprivation of their liberty without just cause and due process; and (VII)[2] liability for costs and attorney fees under 42 U.S.C. § 1988.  Kate's and Andrew's cases were consolidated pursuant to this Court's order dated May 22, 2009.

## III.   Applicable Law and Analysis

### A.   "Due Process"

Defendants argue that Plaintiffs fail to plead or support a Fourteenth Amendment Due Process claim.  As Plaintiffs indicate in their response briefs, however, they are alleging that their rights under the Fourth Amendment– made applicable to the States via the Fourteenth Amendment– were violated as a result of their unlawful arrest and the unlawful seizure of their property.  Plaintiffs have adequately pleaded such a claim in Count VI of their complaints and thus Defendants' argument is not a basis for dismissal.

---

[2]This last count actually is labeled in both Kate's and Andrew's complaints as a second "Count VI."

11

### B.        Search and Seizure

With respect to the search of the Mills' property, Deputy Brooks was lawfully present on the property on March 15 pursuant to Judge Roberts' order. The order directed the United States Marshal's Office "to maintain such presence at [the Mills' property] as it deems necessary in order to assist the court in the enforcement of the terms of this order." The Deputy United States Marshal in charge of the operation, Deputy Batcheller, directed the Lapeer County Sheriff Deputies (Deputies Brooks and Radenbaugh) and State Trooper McGuckin to secure the property before Charter Communications' technician entered. (Doc. 37 Ex. 30 at 42.) As Deputy Batcheller described his "operations plan" in his testimony during the Mills' criminal case:

> It's a verbal operations plan, that myself . . . and another Deputy, would go to the front door and the back door and attempt to make contact with the individuals that were resident at the residence. Other deputies would go to any – they would check any garages, out buildings, barns, or anything like that for any signs of any individuals.

(*Id.*) According to Deputy Batcheller, he specifically instructed the state officers "[t]o check barns, check garages, and check out buildings for occupants of the residence." (*Id.* at 42-43.)

Deputy Brooks consistently has testified (in the criminal proceedings and in his deposition in this case) that he approached and entered the Mills' pole barn to announce the officers' presence and determine whether anyone was inside as part of his job to secure the premises for the Charters Communications' technician. (Doc. 28 Ex. 3 at 21;

12

Doc. 37 Ex. 31 at 117-18.)  As a result, it matters not whether he first saw the two dead lambs before or after stepping inside the pole barn.  Plaintiffs argue that the officers had been advised that Mr. Mills was attending a hearing in Lansing on the date the order was executed.  However, this fact does not impact the Court's determination that Deputy Brooks was acting in accordance with Judge Roberts' order when he entered the barn. Deputy Brooks testified in the criminal proceedings that while "[they] didn't believe [Mr. Mills] was going to be there, . . . [they] didn't know for sure."  (Doc. 37 Ex. 31 at 129.) Additionally, other family members were known to live on the property and there were vehicles on the property when the officers arrived the morning of March 15.  (*Id*. at 121-22; Doc. 28 Ex. 3 at 14-15.)

Because Deputy Brooks entered the Mills' property (including the pole barn) pursuant to the directions in Judge Roberts' order, he did not engage in an unlawful search of the property on March 15.  Once Deputy Brooks observed the dead lambs and emaciated dogs on the property, the warrantless entry onto the property by animal control officers Woolner and Frantz and the subsequent removal of the three severely emaciated dogs did not contravene the Fourth Amendment.  As the Michigan Court of Appeals has held, animal control officers do not violate the Fourth Amendment when they enter property and remove animals that have been lawfully observed and appear to be in danger.  *People v. Johnson*, 104 Mich. App. 629, 634-35, 305 N.W.2d 560 (1981); *see also People v. Green*, No. 225191, 2001 WL 1585294, at *1 (Mich. Ct. App. Dec. 11, 2001) (upholding the warrantless search and seizure of the defendant's severely

13

underweight dog, observed from the defendant's driveway, based on the plain view and exigent circumstances exceptions to the warrant requirement).

Having concluded that the officers were lawfully present on the property (including inside the pole barn) on March 15, the Court must reject Plaintiffs' challenge to the warrant obtained based on the information gleaned during that search. Plaintiffs contend, however, that the officers exceeded the scope of the warrant when they seized three dogs without a veterinarian first determining that the animals were neglected. Yet the above-cited cases establish that the officers could have lawfully seized the dogs even without a warrant pursuant to the exigent circumstances exception to the Fourth Amendment's warrant requirement.

For the above reasons, the Court concludes that Defendants Brooks and Rodabaugh did not violate Plaintiffs' Fourth Amendment rights when they searched the Mills' property on March 15 and 16 and when they seized live and dead animals from the property on the latter date. Accordingly, the County of Lapeer also is not liable for such a violation. The Court therefore finds it unnecessary to address Defendants' alternative arguments for summary judgment as to Plaintiffs' unlawful search and seizure claims, i.e., that Kate and/or Andrew lack standing to challenge the searches and seizures and that the officers are entitled to qualified immunity. Defendants are entitled to summary judgment with respect to Plaintiffs' Fourth Amendment claim brought pursuant to § 1983, to the extent the claim alleges an unlawful search and seizure (Count VI).

**C.  Prosecution**

14

Plaintiffs challenge the filing of criminal charges against them, contending that Defendants pursued those charges without sufficient information indicating that Plaintiffs owned or were responsible for the care of the subject animals.  In their response briefs, Plaintiffs also appear to argue that Defendants should not have brought the animal cruelty charges where there was evidence indicating that the dogs and horse were being properly cared for, as they recently had been "treated" by a veterinarian.  These challenges form the basis of Plaintiffs' false arrest and/or false imprisonment claims and malicious and negligent prosecution claims and are alleged as part of their § 1983 claims.

Defendants assert that the arrest and prosecution of Plaintiffs were lawful because there was probable cause to believe that they committed the charged offenses.  Even if probable cause was lacking, Defendants contend that they are entitled to qualified immunity.  Finally, Defendants briefly argue that Deputy Brooks and Director Rodabaugh cannot be held liable for any unlawful arrest and prosecution of Plaintiffs because the decision on whether to prosecute them rested with the County Prosecutor.

### 1.      Kate Mills

The existence of probable cause to charge Kate defeats her negligent and malicious prosecution claims (including her § 1983 claim to the extent it alleges malicious prosecution) and her false arrest and/or false imprisonment claims.[3]  *See Boykin v. Van*

---

[3]This Court only was able to locate one Michigan case discussing a claim of "negligent prosecution" and in that case the court concluded that no such cause of action exists. *King v. Arbic*, 159 Mich. App. 452, 459-60, 406 N.W.2d 852, 855 (1987).

*Buren Township*, 479 F.3d 444, 452 (6th Cir. 2007) (explaining that claims of false arrest, false imprisonment, and malicious prosecution each "are premised on a lack of probable cause"); *Darrah v. City of Oak Park*, 255 F.3d 301, 312 (6th Cir. 2001) (explaining that a § 1983 claim for malicious prosecution will not lie where there is probable cause to prosecute).  "[P]robable cause exists when the police have 'reasonably trustworthy information . . . sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense.'" *Gardenshire v. Schubert*, 205 F.3d 303, 315 (6th Cir. 2000) (quoting *Beck v. Ohio*, 379 U.S. 89, 91, 85 S. Ct. 223, 225 (1964)). "Probable cause determinations involve an examination of all facts and circumstances within an officer's knowledge at the time of an arrest." *Id.* (internal quotation marks and citation omitted).  "A valid arrest based upon then-existing probable cause is not vitiated if the suspect is later found innocent."  *Criss v. City of Kent*, 867 F.2d 259, 262 (6th Cir. 1988).

"A person who willfully, maliciously and without just cause or excuse kills, tortures, mutilates, maims, or disfigures an animal" is guilty of a felony under Michigan Compiled Law Section 750.50b.  The Michigan courts have held that this section only requires a showing that the defendant "acted with conscious disregard of the known risks, and not that [he or she] acted with an intent to cause harm."  *People v. Henderson*, 282 Mich. App. 307, 311-12, 765 N.W.2d 619, 623 (2009).  The misdemeanor charge of animal cruelty under Michigan Compiled Law Section 750.50 lies *inter alia* where an "owner, possessor, or person having the charge or custody of an animal . . . fail[s] to

16

provide an animal with adequate care." Mich. Comp. Laws § 750.50(2)(a). The statute defines "adequate care" as "the provision of sufficient food, water, shelter, sanitary conditions, exercise, and veterinary medical attention in order to maintain an animal in a state of good health." *Id*. § 750.50(1)(a). Any person who places a dead animal or part of a carcass on property within one mile of a residence is guilty of a misdemeanor under Michigan Compiled Law Section 750.57. Finally, failure to license a dog is a misdemeanor in violation of Michigan Compiled Law Section 287.262.

The facts known to Director Rodabaugh established probable cause for the charges he proposed against Kate. Although not a veterinarian, as of March 2007, Director Rodabaugh had over thirty four years of experience working with abused and/or neglected animals. He worked at a county animal shelter for fifteen years and had served as the Director of the Lapeer County Animal Shelter for nineteen years. (Doc. 28 Ex. 5 at 5-6.) He had been attending seminars in the care, treatment, and/or assessment of animals through the Michigan Animal Control Officers Association twice a year since 1978. (*Id*. at 15-16.)

The pertinent findings in the death of the horse recovered from the Mills' property, as reported by Dr. Agnew, were choke "associated with severe dehydration, emaciation, and aspiration pneumonia." Dr. Agnew explained that one cause of choke is voracious eating due to starvation and/or dehydration. While, as Plaintiffs point out, choke also can be caused by psychological, neurological, or physiological conditions, the evidence known to Director Rodabaugh reasonably suggested that starvation was the probable

17

cause of this horse's choke.  Specifically, the three live dogs removed from the property were determined to be severely emaciated, as were all of the nine dead lambs.  Three of the dead lambs also were dehydrated.  The animal control officers observed no food and/or water available for the animals.

Plaintiffs contend that Dr. McGhee's records contained "exculpatory evidence" which should have led a reasonable officer to conclude that the dogs and horse were being provided adequate medical care.  The severity of the dogs' condition, however, undermines Plaintiffs' argument.  As Dr. Thorpe opined, based on the degree to which their bodies had deteriorated and how quickly they achieved good health in response to treatment, the animals had been deprived adequate care for months or years.  Moreover, as County Prosecutor Konschuh indicated in his deposition, there was some question as to whether the animals actually were seen by Dr. McGhee on each of the occasions noted in his records or if his records only reflected information provided by the Mills (specifically Kate while she worked for Dr. McGhee.  (Doc. 28 Ex. 10 at 43.)

Plaintiffs' primary complaint, however, is not the finding that the animals received inadequate care or were tortured but rather that Plaintiffs were charged with such conduct. In other words, Plaintiffs challenge whether there was probable cause to find that they owned or were responsible for the care of the animals.  The evidence known to Defendants, however, set forth probable cause to conclude that Kate owned the animals (and perhaps cared for them on the weekends).

Dr. McGhee's records listed Kate as the owner of the horse and dogs and there was

18

other evidence known to the officers indicating that Kate owned the animals, including statements by the Mills' neighbors and other complaints where Kate was identified or identified herself as the animals' owner.  (Doc. 28 Ex. 24 and Ex. 5 at 27.)  Moreover, in prior cases involving Mr. and/or Mrs. Mills and animals on their property (or animals from their property that had escaped and were found on the road or on neighbors' property), the charges were dropped when they claimed that the animals belonged to Andrew or Kate. (Doc. 28 Ex. 5 at 17-18.).  While Director Rodabaugh knew that Kate was a student at Michigan State University, he also was aware of the evidence indicating that she came home on weekends.  (*Id*. at 45.)

Therefore, Defendants are entitled to summary judgment with respect to Kate's claims alleging malicious and negligent prosecution (Counts II and III), false arrest and/or false imprisonment (Count I), and a violation of Section 1983 based on false arrest and/or false imprisonment (Count VI).

### 2.    Andrew Mills

Unlike Kate, there does not appear to be evidence indicating that Andrew owned any of the animals at issue.  County Prosecutor Konschuh's testimony during his deposition in this case suggests that Andrew was charged primarily because he lived on the property and to dissuade the other family members from escaping liability by claiming that he was the owner and caretaker of the animals.  (*See* Doc. 28 Ex. 10 at 38-39, 41.) There was evidence suggesting that Andrew was responsible in some manner for the animals' care (*see id*.); but the Court does not find this evidence sufficient to conclude as

19

a matter of law that probable cause existed to support the decision to charge him.  For other reasons, however, the Court concludes that Defendants are entitled to summary judgment with respect to Andrew's prosecution claims.

Case law establishes that a defendant cannot be held liable for malicious prosecution when the defendant did not make the decision to prosecute the plaintiff. *Skousen v. Brighton High Sch.*, 305 F.3d 520, 529 (6th Cir. 2002).  Yet a subsequent decision by the Sixth Circuit suggests that a defendant who "conspired with, influenced, or even participated in" the prosecutor's decision to bring charges against an individual may be held liable for the decision.  *McKinley v. City of Mansfield*, 404 F.3d 418, 444 (6th 2004).  Deputy Brooks, however, did not make the decision to prosecute Andrew and there is no evidence suggesting that he "conspired with, influenced, or even participated in" that decision.  Defendant Rodabaugh, on the other hand, recommended specific charges and compiled the evidence against Andrew for County Prosecutor Konschuh. Whether this is sufficient to hold Defendant Rodabaugh liable for the prosecution decision is unclear.  Nevertheless, Defendant Rodabaugh is entitled to summary judgment on other basis.

With respect to Andrew's state law claims, Director Rodabaugh is the highest appointive elective official of the Lapeer County Animal Control.  (Doc. 28 Ex. 10 at 67-68.)  Michigan law provides absolute immunity from tort liability for such officials when acting within the scope of their employment:

> A judge, a legislator, and the elective or highest appointive

20

> executive official of all levels of government are immune
> from tort liability for injuries to persons or damages to
> property if he or she is acting within the scope of his or her
> judicial, legislative, or executive authority.

Mich. Comp. Laws § 691.1407(5).  "The employee must have been acting within the scope of the reasonable power delegated to him to accomplish the business of his employer under the circumstances and the actions must have been taken in furtherance of the employer's purpose."  *Cibulas v. Bayside Homes, LLC*, No. 247738, 2004 WL 1057821, at *2 (Mich. Ct. App. May 11, 2004) (citing *Backus v. Kauffman (On Rehearing)*, 238 Mich. App. 402, 407-09, 605 N.W.2d 690 (1999)).

It is clear from Director Rodabaugh's and County Prosecutor Konschuh's deposition testimony that, as head of the Lapeer County Animal Shelter, Director Rodabaugh is charged with the responsibility of enforcing the laws related to animals in the County of Lapeer.  This responsibility includes the power to investigate possible violations, gather evidence for the prosecutor, educate the prosecutor on the applicable animal control laws, and assist the prosecutor in the prosecution of any charges.  (Doc. 28 Ex. 5 at 6-8, 33, 34-35; Ex. 10 at 25-26, 60.) Notably, the officers working under Director Rodabaugh's control are deputies from the Lapeer County Sheriff's Department.  (*Id*. Ex 5 at 7.)  Therefore, for purposes of analyzing his immunity under Section 691.1407(5), the Court finds his position comparable to the head of a city police department or a county sheriff's department and the Michigan courts have concluded that such an individual is entitled to absolute immunity with respect to the decision to prosecute an

21

individual.  *See Payton, supra.*

With respect to Andrew's § 1983 claim, the Court concludes that Director

Rodabaugh is entitled to qualified immunity.  The two-part test for qualified immunity

asks: (1) whether the facts that a plaintiff has alleged or shown make out a violation of a

constitutional right; and (2) if so, whether the right at issue was clearly established at the

time of the defendants' alleged misconduct.  *Pearson v. Callahan*, 129 S. Ct. 808, 816

(2009) (holding sequential analysis no longer mandatory); *Saucier v. Katz*, 533 U.S. 194,

201, 121 S. Ct. 2151, 2156 (2001).  "The 'clearly established' inquiry 'must be

undertaken in consideration of the specific context of the case, not as a broad general

proposition. . . .'" *Jones v. Byrnes*, 585 F.3d 971, 978 (6th Cir. 2009) (quoting *Katz*, 533

U.S. at 201, 121 S. Ct. at 2156). To be "clearly established . . . '[t]he contours of the right

must be sufficiently clear that a reasonable official would understand that what he is

doing violates that right.'" *Id*. at 202 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640,

107 S. Ct. 3034, 3039 (1987)).

In this case, Director Rodabaugh may have erred in believing that there was

probable cause to recommend charges against Andrew.  The Court, however, cannot

conclude that it would be clear to a reasonable animal control director that this action was

unlawful based on the facts presented and in the situation he confronted.  Notably, there

was some evidence that Andrew cared for the animals and an officer reasonably could

conclude that an eighteen year old man living on his parents' farm was responsible in

22

some manner for the care of the animals on the premises.  Additionally, Director

Rodabaugh only recommended charges against Andrew; County Prosecutor Konschuh

made the final decision to prosecute him.  As the Supreme Court recently stated:

> Qualified immunity balances two important interests– the
> need to hold public officials accountable when they exercise
> power irresponsibly and the need to shield officials from
> harassment, distraction, and liability when they perform their
> duties reasonable.  The protection of qualified immunity
> applies regardless of whether the government official's error
> is "a mistake of law, a mistake of fact, or a mistake based on
> mixed questions of law and fact." *Groh v. Ramirez*, 540 U.S.
> 551, 567, 124 S. Ct 1284 (2004) (Kennedy, J., dissenting)
> (citing *Butz v. Economou*, 438 U.S. 478, 507, 98 S. Ct. 2894
> (1978) (noting that qualified immunity covers "mere mistakes
> judgment, whether the mistake is one of fact or one of law."))

*Pearson*, 129 S. Ct. 815.

As its employees did not violate Plaintiffs' constitutional rights, the County of

Lapeer cannot be held liable under § 1983.  Moreover, there is no evidence that the

County maintained a policy or practice which caused the alleged unconstitutional

conduct. The County is immune from Plaintiffs' state law claims pursuant to Michigan's

Governmental Immunity from Tort Liability Act, Michigan Compiled Law Section

691.1407(1).  *See* Mich. Comp. Laws § 691.1407(1); *Payton v. City of Detroit*, 211 Mich.

App. 375, 391-94, 536 N.W.2d 233, 241-42 (1995).

For the above reasons, the Court concludes that Defendants are entitled to

summary judgment with respect to Andrew's claims alleging malicious and negligent

prosecution (Counts II and III), false arrest and/or false imprisonment (Count I), and a violation of § 1983 based on false arrest and/or false imprisonment (Count VI).

### D.    Intentional Infliction of Emotional Distress and Abuse of Process

For the reasons discussed above, the County of Lapeer and Director Rodabaugh are immune from liability for Plaintiffs' intentional infliction of emotional distress and abuse of process claims pursuant to Michigan's Governmental Immunity from Tort Liability Act relieves .  (Counts IV and V). The existence of probable cause and the lack of Defendant Brooks' involvement in the prosecution decision with respect to Andrew defeats these claims against him.

## IV.    Conclusion

Based on the above analysis, this Court concludes that Defendants are entitled to summary judgment as a matter of law with respect to the claims alleged in Plaintiffs' complaints.

Accordingly,

**IT IS ORDERED**, that Defendants' motions for summary judgment are **GRANTED**.

> s/PATRICK J. DUGGAN
> UNITED STATES DISTRICT JUDGE

Copies to:
Kevin J. Watts, Esq.
Barry A. Seifman, Esq.
S. Randall Field, Esq.
Marcelyn A. Stepanski, Esq.